UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



TRAVEL LAMONT FIGGINS,
                    Plaintiff,

**DECISION & ORDER**
15-CV-6748

        v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social Security,
                    Defendant.

## Preliminary Statement

Plaintiff Travel Lamont Figgins ("plaintiff" or "Figgins") brings this action pursuant to Title II and Title XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits. See Complaint (Docket # 1). Presently before the Court are competing motions for judgment on the pleadings. See Docket ## 11, 17.

## Background and Procedural History

On April 5, 2013, plaintiff applied for disability insurance benefits and supplemental security income. Administrative Record ("AR") at 179-86. The Social Security Administration made a determination that plaintiff was not disabled on July 9, 2013. AR at 72-89, 106. Plaintiff then

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for former Acting Commissioner Carolyn W. Colvin as defendant in this lawsuit.

timely filed a request for a hearing before an Administrative Law Judge. AR at 114. On November 21, 2014, Administrative Law Judge Gregory M. Hamel (the "ALJ") conducted a hearing on plaintiff's claim. AR at 139-43. On February 12, 2015, the ALJ issued a decision, therein determining that plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. AR at 13-29. Plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council. AR at 9. On October 21, 2015, the Appeals Council declined to review the ALJ's decision, rendering it the final decision of the Commissioner. AR at 1-5. Plaintiff commenced this federal action on December 14, 2015 (see Docket # 1), and the parties filed competing motions for judgment on the pleadings (see Docket ## 12, 17). I heard oral argument on January 12, 2017 (see Docket # 21).

## Medical History

In his application for disability benefits, plaintiff claimed that his ability to work was limited by: (1) knee problems, (2) asthma, (3) a wrist injury, (4) back pain, and (5) depression. AR at 200.

Plaintiff presented to the emergency department at Strong Memorial Hospital on January 26, 2012, with shortness of breath, wheezing, and a non-productive dry cough. AR at 323. He noted

that he ran out of his asthma inhaler a couple of weeks before and that once he gets an inhaler he would be "good." AR at 323. Plaintiff also admitted that he smokes a half a pack of cigarettes a day and admitted to smoking marijuana prior to coming in that day. AR at 323. The nurse practitioner advised that plaintiff cease smoking. AR at 323-24.

On July 19, 2012, plaintiff reported to the medical department at the Monroe County Jail, complaining of wheezing and shortness of breath. He indicated that the cold air affected his ability to breathe. AR at 317. Plaintiff presented again on August 20, 2012, with right lower back pain that was not alleviated with ibuprofen. AR at 326. The provider prescribed Vicodin and Flexeril and directed plaintiff to limit activity. AR at 327.

On October 1, 2012, plaintiff was booked at the Monroe County Jail. There, he reported suffering from asthma, as well as joint and muscle problems. AR at 294-95. He denied using drugs at the time but acknowledged previously being treated for substance abuse. AR at 296. A screener commented that plaintiff's affect and mood were appropriate, and he appeared clean. The screener noted that plaintiff did not appear to be a risk for suicide. AR at 298-99.

Plaintiff presented to the medical staff at the Monroe County Jail again on October 11, 2012, complaining of shortness

3

of breath due to asthma. AR at 302. On October 20, 2012, the medical staff at the Monroe County Jail indicated that plaintiff had not been showing up to receive medication. AR at 307.

He presented again on November 13, 2012, this time complaining of "clicking" in his right shoulder, but denying limitation in movement. AR at 318. Plaintiff returned on December 8, 2012, complaining of painful breathing. AR at 311. A series of x-rays revealed a "trace of atelectasis in the right lower lung." AR at 312. Several days later, on December 11, 2012, plaintiff reported that his lungs hurt and he believed he had pneumonia. AR at 318. On January 17, 2013, plaintiff reported that the pain in his right lung had returned despite his attempts to treat it with throat lozenges. AR at 319.

On February 4, 2013, plaintiff reported that the right lung pain had again returned after his dose of prednisone ended. He denied shortness of breath with physical activity, but had intermittent shortness of breath throughout the day. AR at 320. The following day, plaintiff stated that he responded well to asthma medications but his recurrent pain around his right shoulder blade continued when he "work[s] out hard." AR at 320. His lungs were clear on February 13, 2013. AR at 316.

Two weeks after being released from prison, plaintiff reported to the emergency department again reporting right side lung pain. AR at 328. He was diagnosed with pleurisy. AR at

4

330. During this visit, plaintiff also reported back pain as well as feeling anxious and nervous. AR at 331.

On April 30, 2013, plaintiff presented to Harbinder Toor, M.D., for a consultative physical examination. Plaintiff reported constant, sharp pain in his ankles, knees, and lower back. AR at 339. As a result, plaintiff had a hard time standing, walking, squatting, sitting, bending, and lifting. Dr. Toor noted that plaintiff still had dull pain in his left elbow from a fall a few years ago. AR at 339. Despite the medical records to the contrary, Dr. Toor noted that plaintiff "has never been hospitalized or had ER visits for recent or frequent asthma attacks." AR at 339. Plaintiff also reported to Dr. Toor that he had a mild heart attack three years ago. AR at 339. There is no reference to this heart attack elsewhere in the record. AR at 339. Plaintiff reported to Dr. Toor that he previously used marijuana, but "quit a few years ago." AR at 340. Dr. Toor noted that plaintiff does cooking, cleaning, and laundry, and "showers once a week" and "dresses once a week." AR at 340.

Dr. Toor observed that plaintiff had a difficult time changing for the examination and trying to get out of the chair. He declined to lay down for the exam. AR at 340. X-rays revealed a straightening of the spine. AR at 345. Ultimately, Dr. Toor opined that plaintiff would have moderate to severe

5

limitations in standing, walking, squatting, bending, and lifting. According to Dr. Toor, plaintiff would have moderate limitations for sitting for a long time, and mild to moderate limitations for pushing and pulling with his left arm. AR at 342. Dr. Toor recommended that plaintiff avoid irritants that would precipitate or exacerbate his asthma. AR at 342.

The same day, plaintiff presented to Yu-Ying Lin, Ph.D., for a psychiatric consultative evaluation. During the evaluation, plaintiff reported having an increased appetite and difficulty falling asleep. AR at 347. He reported that his depression and anxiety had worsened over the past several years. AR at 347. These problems resulted in irritability, fatigue, diminished self-esteem, social withdrawal, and diminished sense of pleasure. AR at 357. He also experienced restlessness and difficulty concentrating. AR at 347. Although plaintiff denied current suicidal or homicidal thoughts, he indicated that his last suicidal ideation was about four months ago. AR at 347. He also noted that he continues to have anxiety attacks and outbursts of anger, sometimes resulting in him blacking out. AR at 348.

Dr. Lin observed plaintiff's demeanor as cooperative, his appearance as appropriate, his speech as fluent, but his manner of relating as fair to poor. AR at 348. According to Dr. Lin, he appeared to be coherent and goal-oriented. AR at 349. His

6

mood was neutral and his affect was dysphoric. Plaintiff appeared to have moderate difficulty with attention and concentration, moderate impairment with memory, and seemed to be have below average to borderline cognitive functioning. AR at 349. "He was not able to articulate what his coping strategies are." AR at 349. However, plaintiff reported that he is able to do the cooking, cleaning, and shopping himself.

Dr. Lin concluded that plaintiff can follow and understand simple directions and instructions and can perform simple tasks independently. However, Dr. Lin believed plaintiff would have moderate limitations in maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, making appropriate decisions, and relating adequately to others. Dr. Lin noted that plaintiff would be moderately to markedly limited in appropriately dealing with stress. AR at 350. Dr. Lin diagnosed plaintiff with depressive disorder, generalized anxiety disorder, intermittent explosive disorder, psychotic disorder, and substance abuse in early remission. AR at 350. But, Dr. Lin put plaintiff's diagnosis at "guarded to fair." AR at 351.

On May 18, 2013, plaintiff presented to Rochester General Hospital with complaints of lower back pain brought on by lifting a heavy box. AR at 352. The medical notes indicate that this pain was new and that it was associated with the

lifting of heavy objects. AR at 352. A spinal x-ray was normal. AR at 356. The notes indicate that plaintiff was able to ambulate slowly. AR at 354. He was prescribed pain medication. AR at 358. The notes also indicate that plaintiff's condition began to improve. AR at 354.

Plaintiff then presented to Highland Family Medicine for a follow up on his back pain. Upon examination, Luis Berrios, N.P., noted that plaintiff rated the pain as a 7 out of 10, but that plaintiff was ambulating well. Nurse Berrios also indicated that plaintiff's asthma was "improving" and recommended that plaintiff continue with his current regimen. AR at 359. Nurse Berrios also indicated that plaintiff's lumbago was "not controlled at this time" and that plaintiff would begin physical therapy. AR at 359.

In a self-reported function report on May 20, 2013, plaintiff noted that he was able to dress, bathe, feed, and use the toilet himself. AR at 211-12. He also noted that he prepares meals for himself daily. AR at 212. Plaintiff goes outside four times a day, but his illnesses prevent him from doing yard work. AR at 213. Although plaintiff testified at the hearing that a neighbor takes him around, he reported on the function report that he takes public transportation by himself. AR at 213. He further reported that he is able to pay his own bills and handle his own finances. AR at 214. Plaintiff noted

that he goes out to a friend's house approximately two times per week.   AR at 215.   And, although plaintiff can sit, climb stairs, reach, and use his hands, he is unable to walk or stand for too long (approximately 10 minutes) and cannot lift, kneel, or squat.   AR at 216-17.   As for pain, plaintiff reported stabbing pain in his back and legs, which can last for 30 minutes.   AR at 218-19.   As for his asthma, plaintiff reported that he had several asthma attacks per day.   AR at 221.

In a medical treatment report dated June 18, 2014, plaintiff reported that he takes an albuterol inhaler every six hours, ibuprofen three times daily, lidocaine three times daily, metaxalone three times daily, montelukast nightly, morphine every twelve hours, sertraline daily, and tiotropium daily.   AR at 236.

On June 19, 2013, Nurse Berrios indicated that plaintiff's pain in his lower back had improved somewhat. During the visit, plaintiff also complained of an aching pain in his knees, which he says had been present for years. AR at 361.   And, plaintiff reiterated his history of anxiety and depression.   AR at 361. Importantly, during this visit, Nurse Berrios evaluated plaintiff's respiratory system and remarked "[g]ood respiratory effort.   Clear to auscultation.   Clear to percussion."   AR at 362.   Ultimately, Nurse Berrios referred plaintiff to physical/occupational therapy for his ankle, knee, and lower

back pain, and recommended that plaintiff consider surgery. AR at 362. As for plaintiff's anxiety, Nurse Berrios referred plaintiff to Behavioral Health. AR at 362. And, for plaintiff's asthma, Nurse Berrios prescribed Symbicort. AR at 362.

After evaluating plaintiff, Nurse Berrios completed a medical source statement regarding plaintiff. AR at 367. Nurse Berrios listed plaintiff's prognosis as "good" and indicated that plaintiff was responding well to physical therapy and was expected to recover in four to six months. AR at 366. Nurse Berrios opined that plaintiff could occasionally lift and carry a maximum of 20 pounds, and could stand, walk, sit, push, and pull without limitation. AR at 368.

In a medical source statement dated September 22, 2014, Vivian Jiang, M.D., indicated that plaintiff could lift no more than ten pounds, and could only stand, walk, or sit for less than two hours, having to change positions every half hour. AR at 371. During the physical examination, plaintiff was unable to stay in one position for more than a half hour, could not squat, lacked shoulder range of motion, and grimaced while going up stairs. AR at 371-72. This led Dr. Jiang to conclude that plaintiff would never be able to bend, crouch, or climb ladders, but could occasionally twist or climb stairs. AR at 371. In her opinion, plaintiff would have limits on kneeling and

10

crawling. AR at 372. These limitations would, according to Dr. Jiang, require plaintiff to be out of work more than four days per month. AR at 372. In the medical notes, Dr. Jiang noted that she thought "a lot of his respiratory symptoms are anxiety driven and not asthma related." AR at 394. She also noted that these limitations could be expected to last longer than 12 months. AR at 372.

On July 28, 2014, plaintiff presented to Strong Behavioral Health, with the primary complaint, "I can be happy and then be angry." AR at 373. He reported to Therapist Peter Wilder, LMSW, that he had previously taken Zoloft but recently switched to Prozac, which plaintiff did not believe was helping him. AR at 373. He again reported use of marijuana. AR at 374. Therapist Wilder found plaintiff to be well-groomed and cooperative, with a full affect and normal thought process. He was alert and oriented, with average intelligence and judgment, but poor impulse control. AR at 376. He remained hopeful that things would improve in his life. AR at 376. Therapist Wilder put plaintiff's risk of suicide at "low/moderate." AR at 376. However, Therapist Wilder indicated that plaintiff's prognosis was "elevated" for violence due to past conduct. AR at 377. Therapist Wilder noted that if plaintiff engaged in therapy and addressed his possible substance abuse and mental health issues, the "risks will be significantly mitigated." AR at 377.

11

Therapist Wilder diagnosed plaintiff with depressive disorder. AR at 377.

At a subsequent session on August, 12, 2014, plaintiff reported that he was feeling "stable." AR at 382. On August 25, 2014, plaintiff again attended a therapy session. He presented as a guarded and angry, but engaged, and reported having bouts of overwhelming anger. AR at 384. Therapist Wilder provided a great deal of feedback and support and recommended that plaintiff continue treatment. AR at 385.

The following month, on September 4, 2014, plaintiff reported for a psychopharmacological evaluation, where he reported rapid and dramatic changes in his mood. AR at 386. He also indicated that his sleep was poor. AR at 386. Plaintiff stated that he felt better on Zoloft, and requested that he be placed back on it. AR at 386. The provider prescribed a mood stabilizer and re-started plaintiff's Zoloft. AR at 388-89. He presented again for therapy on September 8, 2014, with a bright affect. AR at 390. However, he reported having racing thoughts on a daily basis and severe mood swings, but no voices. AR at 391.

### Hearing Testimony

The hearing took place before the ALJ on November 21, 2014. In addition to the ALJ and plaintiff, plaintiff's attorney Jenna

12

Marks and vocational expert Matthew C. Lampley were also present.

Testimony of Plaintiff: Plaintiff testified that he was 38 years old at the time of the hearing. AR at 37. He dropped out of high school after ninth grade and never received his GED, citing a learning disability. AR at 37-38. He has not worked since his alleged disability date in March 2013, and has not received any unemployment benefits during that time. AR at 38-39. He testified that he subsists on DSS benefits. AR at 38.

According to plaintiff, he last worked for a heating and cooling company, where he would crawl through ducts for 8-12 hours. AR at 38. However, he is no longer able to stretch, bend, or pull like he could previously. AR at 45-46. Before his work as a "crawler," plaintiff worked in a warehouse stacking pallets. AR at 53. This job also involved changing light bulbs, paining, rooting, laying down floors, and demolition. AR at 53. As a result, plaintiff stated that he would regularly lift up to about 80 pounds. AR at 54. Plaintiff also worked in a similar maintenance job for Buckingham prior to working in the warehouse. That job required plaintiff to frequently lift furniture, sometimes around 150 pounds. AR at 55. Finally, plaintiff worked as a porter in a nursing home, where he mostly cleaned the kitchen. AR at 59.

Plaintiff currently lives in an apartment by himself, where he is able to do some of the cleaning and laundry. AR at 39. Although he acknowledges that he can bathe and dress himself, he reported that he receives assistance from his seven-year-old daughter and from a neighbor who lives in his apartment building. AR at 39, 45. Plaintiff stated that he either cooks sitting down, or cooks over a long period of time so that he can alternate sitting and standing. AR at 47. He acknowledged that he can only sit or stand for a period of 30 minutes at a time. AR at 47-48. Because plaintiff does not have a license due to a DWI when he was 17, the neighbor generally takes plaintiff to the store. AR at 40. While at the store, plaintiff gets around on a motorized scooter. AR at 14.

On a typical day, plaintiff listens to music or watches television. AR at 40. But sometimes, plaintiff does nothing because he feels depressed. AR at 40. He does not engage in social activities because he does not "really like being around people or being in public." AR at 41. He constantly worries that someone is behind him. AR at 53. These feelings of paranoia can become so strong that he feels like "somebody trying to get me and capture me." AR at 53. He reported sleeping between two-and-a-half and three hours per night, and taking approximately three naps per day for no more than two hours each. AR at 50. Plaintiff also stated that he has

14

trouble focusing and concentrating, which often causes him to re-read material several times. AR at 50-51. His mood swings, which occur between four and eight times per month, are violent and seemingly spontaneous. AR at 51. These mood swings can be severe, causing plaintiff to become extremely angry. He professed, "I don't want to hurt nobody, but I do have those thoughts and that's bad." AR at 51. Sometimes, plaintiff blacks out during these mood swings. AR at 52. Plaintiff reported that, because of his paranoia and mental issues, he generally worked jobs in which he could work alone so that he did not have to spend much time around other people. AR at 55.

His activities are further curtailed by his pain, which is especially acute in the morning. AR at 46. Although plaintiff admits that sometimes he "loosens up a little bit throughout the day" with the help of stretches and medication, sometimes he does not. AR at 46. On a bad day, plaintiff is unable to even dress or shower himself, and he opts to take sleeping medication to "just go to sleep." AR at 46-47. As an example, plaintiff reported that he could lift a gallon of milk, but it would cause him pain; he could "lift a box of milk with no problem." AR at 50.

Plaintiff reported that he takes seven different kinds of drugs for his ailments. AR at 41. For asthma, plaintiff takes albuterol, Advair, and Tipotropium when necessary. AR at 42,

15

44.   He was unsure of the names of the pain medicines he takes, but  upon  consulting  his  list  of  medications,  plaintiff's attorney  informed  the  ALJ  that  he  takes  Tazodone,  Risperdal, morphine,  Neurontin,  and  Montelukast.   AR  at  42-44.   Plaintiff appeared confused, however, as to whether these medications were for his pain or for his depression and anxiety.   AR at 44.

In  addition  to  taking  the  above-referenced  medications, plaintiff  reports  that  he  smokes  marijuana  for  his  pain,  which his doctors have apparently approved.   AR at 45.   He no longer smokes cigarettes.   AR at 45.

Testimony  of  the  Vocational  Expert:   Vocational  Expert Matthew  Lampley  (the  "VE")  testified  over  plaintiff's  counsel's objection.    The  VE  categorized  plaintiff's  previous  work  into the  following  groups:   (1)  duct  installer,  Dictionary  of Occupational  Titles  ("DOT")  number  869.664-014,  with  a  specific vocational  preparation  ("SVP")  of  4,  and  DOT  and  as  performed exertion  level  heavy;  (2)  floor  cleaner,  DOT  number  381.687-034, with an SVP of 2, DOT exertion level of medium, and as performed exertion  level  of  heavy;  (3)  warehouse  worker,  DOT  number 922.687-058,  with  an  SVP  of  2,  DOT  exertion  level  of  medium,  as performed  exertion  level  (based  on  testimony  that  plaintiff lifted 150 pounds) of very  heavy; and (4) kitchen porter, DOT number  318.687-010,  with  an  SVP  of  2,  and  DOT  exertion  level  of medium.   AR at 57-60.   Plaintiff also acknowledged that he was a

forklift driver, which is encompassed in the warehouse worker classification above, but which also has its own DOT number of 921.683-050, with an SVP of 3 and DOT exertion level of medium (contingent on whether plaintiff could actually get up and move the pallet). AR at 58-59.

The ALJ then asked the VE a series of hypothetical questions. For the first question, the ALJ asked the VE to assume that the person could only do light work with occasional climbing, balancing, stooping, or crawling, but could not climb ladders or work in hazardous environments or with a high concentration of pulmonary irritants, and could only focus on tasks that are routine and repetitive in nature and that require some interaction with co-workers but no contact with the public. AR at 60-61. The VE responded that a person limited in this way could not perform any of plaintiff's past jobs. AR at 61. However, the VE identified that light, unskilled jobs such as sorter or bolts assembler would accommodate the above restrictions. AR at 61-62. The VE also identified two examples of sedentary work that would accommodate the above restrictions: bench hand and table worker. AR at 61-62.

The ALJ then asked the VE to assume the above, but also that the hypothetical person would be (1) "off task a significant portion of the day or absent from work" for about 20-25 percent of the time or (2) off for two or more days per

17

month.  AR at 64.  The VE responded that such a person could not
perform any of plaintiff's past employment or any other jobs.
AR at 64.  In those positions, the VE noted, a person could not
be off task more than ten percent of the time, and no more than
one day per month.  AR at 65.

### Determining Disability Under the Social Security Act

The Evaluation Process:  The Social Security Act provides
that a claimant will be deemed to be disabled "if [s]he is
unable to engage in any substantial gainful activity by reason
of any medically determinable physical or mental impairment
which  . . .  has lasted or can be expected to last for a
continuous period of not less than twelve months."  42 U.S.C. §
1382c(a)(3)(A).  The impairments must be "of such severity that
he is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step
sequential evaluation process:

> 1.  The Commissioner considers whether the
> claimant is currently engaged in substantial
> gainful activity.
>
> 2.  If not, the Commissioner considers
> whether the claimant has a "severe
> impairment" which limits his or her mental

18

> or physical ability to do basic work
> activities.
>
> 3. If the claimant has a "severe
> impairment," the Commissioner must ask
> whether, based solely on medical evidence,
> claimant has an impairment listed in
> Appendix 1 of the regulations. If the
> claimant has one of these enumerated
> impairments, the Commissioner will
> automatically consider him disabled, without
> considering vocations factors such as age,
> education, and work experience.
>
> 4. If the impairment is not "listed" in the
> regulations, the Commissioner then asks
> whether, despite the claimant's severe
> impairment, he or she has residual
> functional capacity to perform his or her
> past work.
>
> 5. If the claimant is unable to perform his
> or her past work, the Commissioner then
> determines whether there is other work which
> the claimant could perform. The Commissioner
> bears the burden of proof on this last step,
> while the claimant has the burden on the
> first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20

C.F.R. §§ 404.1520, 416.920.   Plaintiff bears the burden of

proving his case at steps one through four.   At step five, there

is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do."

Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that

Commissioner "need not provide additional evidence of the

claimant's residual functional capacity" at step five); see also

20 C.F.R. § 404.1560(c)(2).   When evaluating the severity of

mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F. 3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265—66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets

20

any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ made the following determinations. At the first step, the ALJ found that the plaintiff had not engaged in substantial gainful activity since March 13, 2013, the alleged onset date of his disability. AR at 15. At the second step, the ALJ found that the plaintiff had the following severe impairments: chronic pain syndrome, lumbago, asthma, depressive disorder, and generalized anxiety disorder. AR at 16. The ALJ also noted that plaintiff has a history of substance abuse, which, though not severe, is still an impairment. Finally, the ALJ mentioned plaintiff's ankle and knee pain, which he determined to be non-medically determinable impairments. AR at 16. At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have a listed impairment which would have rendered him disabled. AR at 16.

Accordingly, the ALJ moved on to the fourth step, which assesses plaintiff's residual functional capacity ("RFC"). The ALJ concluded that plaintiff could perform light, repetitive, routine work including occasional climbing stairs, stooping, kneeling, balancing, crouching, and crawling, but no climbing

ladders or work in hazardous environments, and with no more than occasional contact with the public or co-workers. AR at 18. The ALJ also found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that the plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. AR at 19.

In so concluding, the ALJ afforded "only limited weight" to the medical source statement of plaintiff's treating physician Dr. Jiang because Dr. Jiang only treated plaintiff once, her findings were inconsistent with "the objective findings found in many other treatment records," including plaintiff's ability on other occasions to perform physical tests he did not or could not perform with Dr. Jiang, and her assessment was inconsistent with plaintiff's own statements regarding his abilities. AR at 21-22.

On the other hand, the ALJ assigned "significant weight" to the opinion of Luis Berrios, N.P. AR at 22. Nurse Berrios concluded that plaintiff was limited to occasionally carrying 20 pounds, but had no other limitations. He opined that plaintiff's spine condition was expected to be resolved within four to six months of physical therapy. AR at 22. This opinion, the ALJ concludes, is consistent with the objective medical evidence, including Nurse Berrios's own notes. Although

22

Nurse Berrios is not an accepted medical source under the regulations, the ALJ afforded his opinion weight because Nurse Berrios had treated plaintiff on several occasions and his opinions are consistent with his own notes and the objective medical evidence as a whole. AR at 22.

The ALJ assigned significant weight to the portion of the consultative physical examiner's report in which Dr. Toor opined that plaintiff would have moderate to severe limitations in standing, walking, squatting, bending, and lifting. AR at 22. The ALJ found, however, that limiting plaintiff to light work adequately addressed Dr. Toor's opinion that plaintiff would have difficulties pushing and pulling with his left arm. AR at 22-23. Based on the above, the ALJ found that plaintiff could engage in light work requiring lifting no more than 20 pounds at a time with occasional bending and stooping. AR at 22.

The ALJ also afforded significant weight to the opinion of Dr. Yu-Ying Lin, the psychiatric consultative evaluator. AR at 24. Dr. Lin opined that plaintiff would have moderate limitations in maintaining attention and concentration and moderate limitations in learning new tasks, performing complex tasks independently, and relating adequately to others. AR at 24. She also determined that plaintiff would have moderate to marked limitations in appropriately dealing with stress "due to lack of motivation and stress-related problems." AR at 24. The

23

ALJ found these conclusions to be consistent with her findings on examination and the plaintiff's own statements regarding his abilities to perform daily tasks. Accordingly, the ALJ limited the plaintiff to only occasional involvement with the public or co-workers. AR at 24.

The ALJ assigned similarly "great weight" to the opinion of the State Agency medical consultant, T. Harding, Ph.D. Dr. Harding concluded that plaintiff could perform simple, low-contact work regularly. AR at 24. The ALJ determined that this opinion was consistent with the plaintiff's treatment history (including therapy notes) and his own reported activities. AR at 24.

The ALJ considered, but ultimately discredited, references in the record to plaintiff's Global Assessment of Functioning ("GAF") score. For example, Peter Wilder, LMSW, assigned plaintiff a GAF score of 50, which is emblematic of serious mental issues. AR at 25. This score, according to the ALJ, is not consistent with the medical evidence or with Social Worker Wilder's own treatment notes, which "offer a starkly different assessment of the claimant's functioning." AR at 25.

Finally, the ALJ pointed out several other inconsistencies between plaintiff's claims and the medical evidence. For example, plaintiff asserted that he had hallucinations, but there was scant evidence of these episodes in the record. And,

24

plaintiff claimed to have difficulty breathing but also admitted to smoking marijuana recently and smoking cigarettes as late as four months before the hearing. AR at 25.

At the fifth step, the ALJ determined that plaintiff would not be able to perform past relevant work as a duct installer, floor cleaner, warehouse worker, or kitchen porter. AR at 26. However, the ALJ concluded that based on plaintiff's RFC, there would be jobs that exist in significant numbers in the national economy that claimant could perform. Even if plaintiff could only perform sedentary work, the ALJ found that there would still be jobs plaintiff could perform. AR at 27. Accordingly, the ALJ determined that plaintiff was not disabled. AR at 27.

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007). "Substantial

evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447–48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotations omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether

26

the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff challenges the ALJ's decision on several grounds, each of which I address below.

I. Stress Assessment: First, plaintiff quarrels with the ALJ's assignment of "significant weight" to the report of psychological consultative examiner Yu-Ying Lin, M.D., without incorporating Dr. Lin's opinion about plaintiff's ability to handle stress into the ALJ's RFC. Plaintiff further argues that even if the ALJ deliberately omitted this stress finding, he

should have explained his reasons for doing so.    Plaintiff's Br.
(Docket # 12), at 4-5.

In response, the Commissioner argues that the ALJ accounted
for plaintiff's limitations on stress by restricting him to, in
the Commissioner's words, "non-strenuous work, in a non-
hazardous environment, where he would only be required to
perform routine and repetitive tasks with no more than
occasional contact or interaction with the public and co-
workers."    Commissioner's Br. (Docket # 17-1) at 17.    In other
words, the Commissioner believes that the ALJ's finding that
plaintiff could only do routine and repetitive tasks with
limited interaction with others implicitly addressed plaintiff's
stress levels, as determined by Dr. Lin, and as given weight by
the ALJ.

I agree with the Commissioner.    Pursuant to the
Commissioner's policy guidance, the ALJ is required to make a
thorough, individualized assessment of stress in his RFC. See
Petrie v. Astrue, No. 08-cv-1289, 2010 WL 1063836, at *2
(N.D.N.Y. Mar. 19, 2010) ("When 'determining whether mentally
impaired individuals will be able to adapt to the demands of
"stress" of the workplace,' the ALJ is required to make a
thorough, individualized evaluation . . . .") (quoting Soc. Sec.
Ruling 85-15, 1985 WL 56857, at *4-5), aff'd, 412 F. App'x 401
(2d Cir. 2011).    Specifically, the ALJ must focus on the

individual's ability "to understand, carry out, and remember
simple instructions; to respond appropriately to supervision,
coworkers, and usual work situations; and to deal with changes
in a routine work setting." Soc. Sec. Ruling 85-15, 1985 WL
56857, at *4-5. Although the ALJ did not specifically reference
"stress" in his RFC, he did discuss Dr. Lin's opinion — to which
he assigned great weight — that plaintiff would be moderately to
markedly limited in appropriately dealing with stress. AR at
24. There, he pointed out that Dr. Lin "indicated that claimant
was moderately to markedly limited in appropriately dealing with
stress due to lack of motivation and stress-related problems,"
but that plaintiff could perform household tasks by himself. AR
at 24. Therefore, the ALJ limited plaintiff to only occasional
public contact. AR at 18.

The ALJ may not have mentioned stress explicitly, but he
implicitly incorporated the effects that stress would have on
plaintiff in his RFC and the questions he asked the VE. The RFC
therefore adequately accounts for plaintiff's stress
limitations, despite the fact that it does not explicitly use
the term "stress." See Reyes v. Colvin, No. 14-CV-734-JTC, 2016
WL 56267, at *5-6 (W.D.N.Y. Jan. 5, 2016) (Curtin, J.) ("In the
court's view, although the ALJ did not specifically include
stress limitations in his RFC assessment, his reliance on the
findings and observations of the consultative medical sources in

terms of their consideration of plaintiff's stress-related functional limitations, as well as his comprehensive consideration of the hearing testimony, objective medical evidence, and treating and consultative medical source opinions, represents the kind of thorough, individualized mental RFC evaluation contemplated by SSR 85-15 and the overall requirements of the Social Security regulations and rulings."); see also Scanlon v. Colvin, No. 15-CV-0145-A, 2016 WL 4944332, at *8 (W.D.N.Y. Sept. 16, 2016) (Arcara, J.) ("On the basis of this assessment, Plaintiff Scanlon's ability to perform simple work with occasional contact with others adequately reflects his limitations with regard to stress and is supported by the evidence of record."); Cosme v. Colvin, No. 15-CV-6121P, 2016 WL 4154280, at *13 (W.D.N.Y. Aug. 5, 2016) (Payson, J.) (RFC limiting plaintiff to unskilled work that did not require contact with coworkers or the public "adequately accounted for [plaintiff's] limitations, including any limitations dealing with stress"); Steffens v. Colvin, No. 6:14-CV-06727 (MAT), 2015 WL 9217058, at *4 (W.D.N.Y. Dec. 16, 2015) (Telesca, J.) ("In this case, the RFC finding requiring low contact with coworkers and the public adequately accounted for plaintiff's stress.").

As a result, the ALJ's questions to the VE based on this RFC were appropriate, even if they did not explicitly ask about stress. Steffens, 2015 WL 9217058, at *4 ("In light of the

30

Court's finding that the ALJ properly formulated plaintiff's RFC, the Court correspondingly finds that the ALJ's questions to the vocational expert . . . , which were based on the RFC finding described above, were supported by substantial evidence.").

II. Limitations on Concentration, Persistence, or Pace: Relatedly, plaintiff argues that the ALJ found plaintiff to have moderate limitations on concentration, persistence, or pace at Step Three, but failed to account for these limitations in his RFC or in his questioning of the VE.   Docket # 12, at 8.   The Commissioner contends that the ALJ accounted for these limitations by questioning the VE about plaintiff's ability to perform "routine and repetitive" tasks (AR at 61), and ultimately limiting plaintiff to performing such "routine and repetitive tasks" (AR at 24).

The RFC:   The ALJ implicitly incorporated into Step Four his finding at Step Three that plaintiff was moderately limited in concentration, persistence, or pace.   In his RFC, the ALJ limited plaintiff to "routine and repetitive tasks" that "do not require more than occasional public contact or more than occasional interactions with co-workers."   AR at 18.   In support of this RFC, the ALJ considered Dr. Lin's finding that plaintiff's "attention, concentration, as well as recent and remote memory skills were impaired due to anxiety in the

31

evaluation or limited intellectual functioning." AR at 23. He also referenced therapy notes that consistently demonstrated that plaintiff "was well-groomed, had a cooperative attitude, made direct eye contact, and demonstrated normal or only slightly impaired mood, speech, affect, thought process, thought content, perception, concentration, memory, judgment, and orientation." AR at 23. He assigned weight to Dr. Lin's opinion that plaintiff could "perform simple tasks independently" but that plaintiff would have "moderate limitations maintaining attention and concertation, and mild limitations for maintaining a regular work schedule, and moderately limited in learning new tasks." AR at 24. Finally, the ALJ afforded "great weight" to state agency consultant Dr. Harding's opinion that plaintiff had "only slightly impaired . . . concentration, memory, judgment, and orientation." AR at 24. Because the ALJ's findings regarding concentration, persistence, and pace were incorporated, as described above, into his RFC, he did not err in explicitly referencing them at Step Four. See McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014).

The Hypotheticals: In the Second Circuit, "an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace." McIntyre, 758 F.3d at 152 (emphasis added). However, this failure is harmless error if "(1) medical evidence demonstrates that a claimant can engage

32

in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]" Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011) (internal quotation marks omitted)).

In McFall v. Colvin, No. 15-cv-6176, 2016 WL 1657877 (W.D.N.Y. Apr. 27, 2016), Judge Siragusa held that both prongs of the first exception were met. The court found that the evidence limited plaintiff to "simple work," meeting the first prong of McIntyre's first exception. The court also determined that by limiting his hypothetical to "simple work," the ALJ's hypothetical met the second prong of McIntyre's first exception, namely that the hypothetical be limited to "unskilled work." Id. at 9.

Similarly, here, while the ALJ's hypothetical and RFC here may not explicitly incorporate concentration, persistence, and pace, McIntyre's first exception applies.[2] The evidence in the

---

[2] It is important to note here that before McIntyre, courts appeared to require explicit discussion concentration, persistence, and pace in the RFC and in the questions asked of the VE, without exception. See Thompson v. Astrue, No. 10-CV-6576 CJS, 2012 WL 2175781, at *13 (W.D.N.Y. May 30, 2012) (Siragusa, J.) ("Moreover, when making findings about a claimant's RFC, an ALJ may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work."); Hudson v. Comm'r of Soc. Sec., 10-cv-300, 2011 WL 5983342 (D. Vt. Nov. 2, 2011) (holding that ALJ erred

33

record indicates that, despite plaintiff's limitations in concentration, persistence, and pace, he can perform routine, simple tasks. Dr. Lin opined that plaintiff could perform simple counting and most calculations, and could follow simple instructions, perform simple tasks independently, and, for the most part, maintain a regular schedule. AR at 349. By referencing simple work, the ALJ's RFC meets the first element of the first exception. See Steffens, 2015 WL 9217058, at *4 (finding limits on concentration, persistence, and pace adequately reflected in RFC when medical evidence demonstrated that plaintiff could follow simple and complex instructions, and perform routine, simple work).

In addition, the ALJ limited the hypothetical to unskilled work, meeting the second element of the first exception. The ALJ limited the hypothetical to "tasks that are routine and repetitive in nature," meaning tasks that "would not be complicated or complex or hard to remember." AR at 61. Like the hypothetical that limited the plaintiff to "simple work" in McFall, the ALJ's hypothetical here made clear, without using the word "unskilled," that the ALJ was limiting the hypothetical to such work. In the event it was not clear that the ALJ intended to limit the hypothetical to unskilled work, he

in posing hypothetical to VE that merely indicated that plaintiff could perform "repetitive tasks with brief and superficial contact with the general public, coworkers, and supervisors" and did not indicate any limitations on concentration, persistence, and pace).

34

followed up by asking: "And are you able to identify any light, unskilled jobs that would accommodate these restrictions?" AR at 61. This substantially meets the McIntyre's first exception, and the court need not analyze the second, alternative, exception.

III. ALJ's Treatment of Treating Physician Jiang and Consultative Evaluator Toor: Plaintiff next argues that the ALJ failed to provide good reasons for giving consultative examiner Dr. Toor's opinion "significant weight" while giving a similar opinion from plaintiff's treating physician Dr. Jiang "little weight."

I disagree. These two opinions are not as similar as plaintiff suggests. Dr. Toor concluded that plaintiff would have "moderate to severe limitations" for standing, walking, squatting, bending, and lifting, but only moderate limitations on sitting. AR at 342. These moderate limitations for sitting "suggest[] a possibility that prolonged standing may pose a problem." Malone v. Comm'r of Soc. Sec., No. 08-CV-1249 GLS/VEB, 2011 WL 817448, at *10 (N.D.N.Y. Jan. 18, 2011). On the other hand, Dr. Jiang opined that plaintiff could not do any of these tasks — stand, walk, or sit — for more than two hours during an eight-hour workday. AR at 371. In other words, Dr. Jiang's opinion suggests plaintiff would be much more limited in his ability to sit than Dr. Toor's opinion would allow. Based

on these differences, it was not error for the ALJ to weigh the opinions differently.

The ALJ's treatment of Dr. Jiang's opinion is also supported by other aspects of the record. Dr. Jiang's findings are somewhat inconsistent with other treatment records. AR at 21. Specifically, although plaintiff declined to perform tests involving squatting, hip movement, and lying down — as he similarly refused to do for Dr. Toor — he performed these tasks at other points in treatment. AR at 358. Dr. Jiang's findings are also inconsistent with the report from Nurse Berrios, who, although not an acceptable medical source, treated plaintiff on several occasions. Dr. Jiang's findings also appear to be contradicted by plaintiff's own statements regarding his daily activities: Plaintiff indicated during his testimony that he is able to do cooking, cleaning, and laundry, albeit in a limited capacity. Finally, Dr. Jiang treated plaintiff only once prior to rendering the opinion. AR at 21.

Even if the ALJ erred in assigning Dr. Jiang's opinion little weight the error was harmless because the VE opined that even if plaintiff was limited to sedentary work (as compared to light work), plaintiff would still be able to work. AR at 27.

## Conclusion

For the foregoing reasons, the plaintiff's motion for judgment on the pleadings (Docket # 11) is **denied**, and the Commissioner's cross-motion for judgment on the pleadings (Docket # 17) is **granted**.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     March 29, 2017
           Rochester, New York

37